**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

Case No.: 3:21-cv-1160
L.T. No.:  16-2002-CF-6549

**TAKOYA DOMINIC CRINER,**

Petitioner,

vs.

**SECRETARY**,
Department of Corrections,
State of Florida,

Respondent.

_____/


**AMENDED PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON**
**IN STATE CUSTODY UNDER 28 USC § 2254**
**AND SUPPORTING MEMORANDUM OF LAW**

Prisoner's Name:          TAKOYA DOMINIC CRINER
Prisoner's DC No.:        J28952
Place of Confinement:     Columbia Correctional Institution, in Lake City,
                          Florida



Submitted by:
**JOE HAMRICK, ESQ.**
Fla. Bar No. 49047
1999 West Downer Place
Aurora, IL 60134
(630) 897-8764
jhamrick@dreyerfoote.com
Attorney for Petitioner

## INTRODUCTION

This amended petition is timely filed pursuant to 28 U.S.C. § 2244 and 2254 under the doctrine of equitable tolling.  Petitioner, TAKOYA CRINER, is currently confined by the State of Florida in Columbia Correctional Institution, in Lake City, Florida (Columbia County).   Mr. Criner was born on October 13, 1982; his Department of Corrections identification number is J28952.   The judgment of conviction and sentence at issue arises out of the Fourth Judicial Circuit, in and for Duval County, Florida.

## RECORD REFERENCES

The postconviction record on appeal will be referenced as "R" followed by the page number, e.g. (R 1). The trial transcript will be referenced as "TT" followed by the page number, e.g. (TT 1).

## PROCEDURAL HISTORY AND STATEMENT OF FACTS

### I.   Statement of the case

Mr. Criner was arrested on May 28, 2002. On September 5, 2002, he was indicted by grand jury on two counts of first-degree murder of Isaac Eugene Brown, Jr. and Jeffrey Martin Hicks and one count of attempted first degree murder of Gavin Berry. The alleged crimes were committed on May 26 - 27, 2003.

Mr. Criner proceeded to trial on May 9, 2005 and was found guilty as charged.

2

He was sentenced to three life sentences on June 16, 2005. He filed a direct appeal with the First District Court of Appeal ("First DCA") which was affirmed with opinion on November 3, 2006. *Criner v. State*, 943 So. 2d 224 (Fla. 1st DCA 2006). Mandate issued on December 27, 2006. (Docket 1D05-3139).

Attorney Tony Axam filed an initial 3.850 in Mr. Criner's case in November 2011, which was summarily denied by the trial court as procedurally barred several weeks later. Mr. Criner took an appeal of the postconviction denial to the First DCA, which was affirmed in an unpublished order. (Docket, 1D08-246) The mandate was filed with the trial court in August 2008.

In December 2008, Mr. Criner hired a new attorney, Bernard Daley. Daley immediately filed a motion to recall mandate related to the postconviction appeal with the First DCA, as well as filing a notice in the trial court regarding that motion to recall mandate and a motion to enlarge the time for filing a second 3.850 motion. (2002-CF-6549). Prior to a ruling from the trial court on that motion to enlarge time, Daley filed a successive 3.850 motion on March 23, 2009. The trial court summarily denied the motion as procedurally barred. The First DCA reversed and remanded for an evidentiary hearing on the merits of the claims. *Criner v. State*, 59 So. 3d 196, 197 (Fla. 1st DCA 2011).

On May 4, 2011, the parties agreed that Mr. Criner's March 23, 2009 3.850 would be considered on the merits and he was granted leave to amend. On June 27,

3

2011, an amended 3.850 motion was filed with the court. After years of rescheduling the evidentiary hearing, Mr. Criner's then-attorney Bernard Daley was disbarred on April 24, 2015. Attorney Richard Sichta then took over the case and filed a second amended 3.850 on May 9, 2017. The trial court denied the second amended motion after an evidentiary hearing, and Mr. Criner appealed to the First DCA. The First DCA issued a per curiam affirmed decision on July 24, 2020, and its mandate issued on October 6, 2020. *Criner v. State*, 302 So. 3d 318 (Fla. 1st DCA 2020).

On September 30, 2020, Mr. Criner filed a postconviction motion challenging his sentences as illegal based on the 25-year minimum mandatory sentences being imposed upon each of the three counts, under F.S. 775.087(2). (R 1-5.) On October 6, 2020, Mr. Criner filed an additional 3.800(a) motion alleging that Count 3 was illegal on another basis: that it exceeded the statutory maximum, as this offense was wrongly classified as a first-degree felony punishable by life, when it should have been classified as a standard first-degree felony, punishable by a maximum of 30 years in prison. (R 209-19.) The trial judge summarily denied both motions (R 22-24, 403-406), and the First DCA issued a *per curiam* decision affirming. The mandate from that appeal was filed with the trial court on today's date.

4

II.     **Statement of the Facts**

A.     **The Trial**

The issue for the jury was whether the evidence supported that this shooting incident was the result of a struggle over a firearm between Mr. Criner and his friend Mr. Berry, or whether Mr. Criner suddenly, and without provocation, fired upon Mr. Berry and his associates in a premediated fashion.

In May of 2002, the discharge of a firearm at Gavin Berry and Tiffany Heggs' apartment on Town Square Drive resulted in the deaths of Isaac Brown and Jeffrey Hicks, and injuries to Gavin Berry. (TT 278.) Mr. Criner took the stand at his trial to proclaim his innocence. He was 19 at the time of the shooting. (TT 961.) He and Gavin Berry knew each other from high school because they were both athletes. (TT 966.) Criner and some other friends were heading to a concert at a club downtown that night. (TT 965.) He called Berry before the concert, at around 9 or 9:30, to see about buying some marijuana. (TT 965.) He regularly bought marijuana from Berry. (TT 966.) He would usually buy two or three pounds at a time, which he resold for profit. On the night in question, he owed Berry $1,500 from prior sales. (TT 968.)

When Mr. Criner arrived at Berry's, Hicks, Brown, and Heggs were in the living room. (TT 973-74.) Hicks and Brown were Berry's good friends; they helped him sell drugs. (TT 974.) Criner took his shoes off. (TT 1040.) They all sat around,

drank, and smoked for a while.  During that time, Mr. Criner's friend called and told him to hurry up so they could go to the club. Mr. Criner asked Berry to go to the back room to complete the drug deal. (TT 976.) Mr. Criner saw Berry's green marijuana Tupperware bin in the den.  They could not agree on a price because Berry wanted $950 a pound instead of the usual $700-750. Berry was also "pissed off" about the $1,500 that Criner owed him. Berry was ranting and raving in an uncharacteristic way. (TT 980.) Mr. Criner tried to talk Berry into selling him three pounds with the money he had on him, and he told Berry that he would pay back the $1,500 with the profit. (TT 981.) Then Mr. Criner asked if he could just to get two pounds for $1,800. But Berry told Criner he only wanted the $1,500 he was owed.

Hicks was getting a beer from the refrigerator while Berry and Criner were arguing. Brown came over and told them not to argue – saying that $1,500 was petty. Mr. Criner tried to push $1,800 into Berry's hands for two pounds, but Berry slapped the money down. (TT 983.) That made Criner angry, and they started cussing at each other. (TT 984.) Brown tried to get between them. Criner reached around Brown and punched Berry. (TT 985.) Hicks then tried to pull Berry away, and Criner pushed Hicks.  Berry made a move for the white couch where he kept one of his many guns. Berry swung the gun and hit Criner on the back of the head. Brown and Hicks were trying to stop the fight. Criner and Berry starting wrestling and shots were fired during the course of the struggle, resulting in Hicks and Brown being killed and

Berry being wounded. (TT 986-992.)

As Mr. Criner was exiting Berry's residence after the firearm discharged, Berry came out of the house with a shotgun. Criner then ran to the vehicle his friends were waiting in down the street. Mr. Criner was sweating and was out of breath. He told them that he had been robbed – his $3,500 was gone. He told his friends to drop him off at his girlfriend's house on the Northside, but they were pulled over by police on the way. (TT 998-1000, 1003.) Mr. Criner was apprehended after fleeing the car. (TT 1006.)

Mr. Berry testified he was a marijuana dealer on the date of the shooting. (TT 286.) His girlfriend, Ms. Heggs, knew that he sold marijuana out of their home and that he made a living selling drugs. (TT 334-35.) He had about two pounds of marijuana in his den. (TT 290.) At the time of this shooting, Berry did not have a job and was supporting himself by selling drugs. (TT 335.) He had about six visible guns in the closet of the den: two 9 mm handguns, two 9 mm rifles, a Mossberg shotgun, and Hick's gun, a .45 SIG Sauer. (TT 291-92.) He also kept an SKS assault rifle in his bedroom. (TT 292.) Mr. Criner lived nearby and had been coming over periodically since about January of that year. (TT 333.) Berry claimed that he never sold marijuana to Mr. Criner and did not intend to sell him marijuana that night. (TT 331, 342.)

Prior to the shooting, Berry was socializing with Mr. Criner, Brown, and

7

Hicks; they were all drinking beer and smoking marijuana at his residence.  (TT 293, 296.) At some point they went into the den and started playing a video game. (TT 296, 301.) Berry claimed that he, Brown, Hicks were all holding controllers. (TT 301.) Berry claimed that he was seated on the left-hand side of the den next to the TV on the first couch. (TT 299.) Brown was in the middle in a purple beach chair. (TT 299.) Hicks was seated on a black table, also facing the TV. (TT 299.) Criner was not playing the game and was seated behind Brown and Hicks on the black sectional couch. (TT 300.)

According to Berry, there was no disagreement with Criner.  However, Criner suddenly stood up and for no reason fired repeatedly at them. (TT 302.) Berry claimed he stood up and felt the first bullet, then fell back on the couch and played dead. (TT 302.) He said he heard at least seven consecutive shots. (TT 302-03.) Berry declared Criner was holding a silver semi-automatic .380, and that Berry did not own a .380. (TT 304.) Berry said that as Criner went to leave, he went after him and they wrestled for approximately five minutes. Berry said he yelled at Heggs to go in the back and get down. (TT 306.) Berry said Criner pushed him off of him and ran out of the house. (TT 308.) Criner then looked back at Berry and started running down the street. (TT 308.) Berry retrieved his shotgun and chased Criner. (TT 309.) Berry said he saw Criner get in a car with at least three other males. (TT 312.) Berry went back to his house to see if Hicks and Brown were still alive.

8

(TT 313.) He testified that he did not move his large Tupperware of marijuana from the den to the bathroom after the incident and neither did Heggs. (TT 319.)

Officer Jim Davis, the lead detective, testified that it appeared that the tub of marijuana had been moved into the bathroom prior to their arrival and admitted that the crime scene may have been altered in other ways. (TT 885, 887.) The victims were shot with .380 ammunition. (TT 855.) The weapon was never found.

### B.    Postconviction Proceedings

An evidentiary hearing was held in state court on Mr. Criner's Second Amended 3.850 Motion for Postconviction Relief filed on May 9, 2017, which contained five grounds.  (R 92-104.)  The Court granted an evidentiary hearing on all of the grounds but Mr. Criner waived grounds 1, 4 and 5 (R 119) and proceeded to evidentiary hearing on June 15, 2018 on grounds 2 and 3: (2) Ineffective assistance of counsel in failing to investigate and present a crime scene reconstructionist to impeach Berry's testimony regarding the circumstances of the shooting; (3) ineffective assistance of counsel for failing to call the relevant crime scene technicians and FDLE analyst to testify concerning negative gunshot residue (GSR) testing on Criner.

In support of Criner's claim that defense counsel was ineffective in failing to present an expert in crime scene reconstruction, Mr. Criner called Dr. Michael Knox.

Dr. Knox is a former crime scene officer with 15.5 years of experience with

9

Jacksonville Sheriff's Office. He has been doing full-time forensic consulting since 2010. (R 218.) He has a Ph.D. in Criminal Justice. He has taken and/or taught courses in blood pattern analysis, crime scene reconstruction, homicide investigations, and "shooting incident reconstruction." (R220-21.) In this case, Dr. Knox reviewed crime scene photos, police reports, autopsy reports and photographs, and testimony from crime scene officers, detectives, and Berry, Criner, and Heggs. (R 222.)

Dr. Knox disputed much of the state's theory presented at trial and the testimony of its main witness, Mr. Berry. Dr. Knox disagreed with Berry's trial testimony and the state's theory that Mr. Brown was shot while seated in the chair, because of the position of Brown's buttocks -- he could not have slid from his seat just from being shot. There was no physical means of causing that to happen. (R 234.) The outstretched legs, straight body, blood area on the seat back, and position of his arm in armrest indicated that he had fallen into the chair, not that he had been sitting there when shot. (R 234.) His right arm was in the armrest and the armrest was pushed down significantly from where it would normally be. (R 232.) Dr. Knox cited Dr. Arruza's testimony that Brown's gunshot wound was immediately incapacitating, to determine that Brown would have fallen from wherever he happened to be. (R 232.) He was standing somewhere near where his feet were and happened to be moving backward when he was shot, so that he fell back into the chair. (R 233.)

10

Dr. Knox explained that due to the close quarters of the room, Berry's testimony would place Criner extremely close to Brown when the gun was discharged, but there was no stippling on Brown, indicating that Berry's statement was inaccurate. (R 236-37.) Dr. Knox further explained that the transfer stains on the couch in Mr. Brown's blood were distributed in large patterns, indicating fairly substantial movement. There were also abrasions on Brown's right and left knees. (R 238, 280.) While there was some debris on Brown's shirt, which one would expect that to fall off in a standing position, it did not prove that he was sitting when shot because it was impossible to say when the debris was deposited. (R 238-39.) Dr. Knox agreed that the chair arm might have gotten bent when Berry and Criner were scuffling. (R 314.) However, if they had fallen onto the chair during a scuffle, they likely would have disturbed the position of Brown's arm. (R 315.)

Dr. Knox's testimony also discredited Mr. Berry's testimony that Hicks was seated on the table playing a video game at the time of the shooting. Dr. Knox explained that if Berry's testimony were correct, Hicks would have been within reaching distance to Mr. Criner and you would expect to see some evidence of close or intermediate range firing. (R 252.) If the muzzle distance was 24 inches or less there is a 100% chance you would see some evidence of stippling. (R 253.) Dr. Knox explained that the medical examiner said the shot to Mr. Hicks had an upward angle to it, but if Hicks had been seated, you would not see such an angle. (R 253- 55.)

11

Dr. Knox testified that the records concerning Mr. Berry's wounds were not as precise because he was not examined by a medical examiner. (R 277.) He testified that the shot to Berry's shoulder that lodged in his pelvis was a very strong downward shot. This undermined Mr. Berry's testimony, because such a shot could not have occurred if Mr. Criner was shooting from across the room as Berry stated. (R 276-78.)

Dr. Knox explained there were indications that the evidence was tampered with – the Tupperware was moved from where the shooting occurred to the bathroom. (R 239.) It also looked like the controller by Mr. Brown's foot had been moved prior to that photo being taken – they were in the process of moving things around in the crime scene at the point that photo was taken. (R 246-47.) Dr. Knox disputed Det. Smith's testimony that Smith saw the controller in Brown's hand, because there was no record supporting Smith's statement and it could not have fallen from his hand to that position near his feet. Further, there was no blood found on that controller supporting such a claim. (R 247-49) (slide 9.) (R 247-49.) Further the controller by Browns' feet was the only game controller in the room for the gaming system they were using, contradicting Berry's testimony that they were all holding a controller at the time of the shooting rather than engaging in a struggle as stated by Mr. Criner. (R 242.) Dr. Knox pointed out that the green controller, referenced in the State's evidentiary hearing exhibit 1, was for a different gaming

system. (R 243, 245.)

Dr. Knox also found that the blood evidence was inconsistent with Berry's and the prosecutions' account that he was shot on the sofa and struggled with Criner in the back of the room. (R 258-59.) The blood patterns were inconsistent with Berry's testimony that he was shot three times on the sofa, then played dead for up to 15 seconds because the blood recovered and sampled from the sofa was Mr. Brown's blood, not Mr. Berry's. (R 261.)

Dr. Knox explained that the shooting occurred in the front half of the room, rather than the back, as claimed by Mr. Berry, because there was not a single cartridge in the back. (R 265-66.) Accidental movement, or kicking, would not have caused all of the shell casings to be "bunched" on one side of the room. (R 299, 303.) If Criner shot from behind all three of the victims, as claimed by Berry, it would not have been possible for the shell casings to have bounced off the wall and ended up in their location. (R 299- 300.) Further, although Dr. Knox's assessment of the angles of the holes in the walls was an estimate, the high angles indicated that the shooting occurred much closer to the closet than claimed by Berry. (R 271, 303-304.)

Dr. Knox testified about the importance of the negative GSR results on Mr. Criner's hands, explaining "certainly if a person had not fired a gun, then the expectation would be that none would be on their hands, unless they were in the immediate vicinity when it was fired." (R 275.) Dr. Knox explained that GSR can

13

be removed by an intervening event like touching other objects, but it is still probative evidence.

Dr. Knox concluded, after reviewing all of the evidence of blood pattern, trajectories, and injuries sustained, that Mr. Brown and Mr. Hicks were likely standing when shot (R 282), supporting Mr. Criner's testimony and contradicting Mr. Berry's account as well the state's theory of premeditated murder. The evidence was not consistent with Mr. Berry's account that Mr. Criner fired from the back of the room by the black couch. (R 282.) The point of Dr. Knox's investigation and testimony was not to say that it happened exactly like Mr. Criner said. Instead, his conclusion was that there was evidence of a struggle. (R 295.) Despite that there was an undisturbed ashtray on the floor in front of the couch and a red Solo cup that was upright in another area. (R 295-96) it appeared to Dr. Knox that a lot of movement had taken place. He opined that the individuals were closer to the middle of the room at the time of the firearm discharge, then fell into their final locations, as opposed to having been seated in those locations when the firearm was discharged. (R 283.)

FDLE analyst, Debra Lightfoot, also testified for the defense. She conducted gunshot residue analysis in this case prior to trial – she found no gunshot residue present in any of the samples taken from Mr. Criner's hands. (R 209.) She said that a negative result can occur: if the individual was not exposed to the source of GSR; the GSR was removed prior to the sampling; or on rare occasions, the ammunition

did not leave GSR. She did not know whether any of those circumstances existed in this case. (R 214-15.) Actually holding a gun when it was fired would "certainly" result in an individual having more GSR deposited on his/her hands than if a person were standing further away from the gun. (R 211.) Lightfoot did not do any GSR testing on Jeffrey Hicks, Isaac Brown, or Gavin Berry. (R 213.)

Trial counsel testified at the 3.850 evidentiary hearing for the defense and conceded that he failed to consult with a crime scene expert, that it "m[ight] have been a good idea" and "most certainly" would have been better to call such an expert, if he had known the state would contest that there was a struggle. (R 177-78). Counsel admitted that he failed to present the negative gunshot residue results (GSR) due to his error at trial and this remains a "sore issue" for him. (R 154.) Counsel conceded that he failed to attack to Mr. Berry's credibility concerning whether the victims were all holding video controllers at the time of the shooting because he did not understand the significance of that point until trial. (R 168-169, 184-85)

Trial counsel recalled that GSR was examined on Mr. Criner and it came back negative, which would have been "very helpful" and "certainly critical" to his defense because it would have shown that there was a struggle rather than a premeditated murder.  (R 154, 157-58.) Counsel recalled that there had not been any time for Mr. Criner to remove residue from his hands, because he ran from the apartment to the car. (R 155-56.) Counsel tried to present the negative GSR results

at trial through a detective instead of the analyst who did the testing, but failed because the state successfully objected on hearsay grounds. (R 197.) Counsel further failed to present the FDLE analyst who conducted the GSR testing. (R 154.) Counsel claimed he did not want to call the analyst to get the GSR results in because she could have "given a whole bunch of reasons" why the GSR was not there, but he conceded that he had not deposed her and that there was no negative testimony that could have been brought out from the negative GSR results. (R 197-98, 201.) Counsel admitted that the state's hearsay objection "was something I was not ready for and so I could not argue it [the negative GSR results] the way I wanted to argue it." (R 155.) Negative GSR would have supported his argument that Berry's testimony that Mr. Criner was the shooter was not credible and that Mr. Criner "didn't fire a weapon." (R 156-57.)

Although counsel did not think it was necessary at the time, looking back, he believes that it may have been a good idea to hire a crime scene reconstruction expert. (R 177.) Counsel agreed that calling a crime scene expert would have been better than calling the detectives who contradicted his defense by rejecting the possibility of a struggle. (R 178.) Though he never consulted with an expert, counsel "suppose[d]" that an expert could have testified about the trajectory of the bullets, but he does not think it would have changed anything. (R 179.) Without ever consulting with an expert, he said an expert "maybe" could have helped with blood

16

spatter, blood droppings, shell casing locations, and establishing an indicia of tampering, though he did not believe it would have altered the verdict "given the facts that we argued." (R 179.)

Subsequent to the evidentiary hearing, the trial court entered a written order denying both of Mr. Criner's postconviction claims. Mr. Criner timely appealed the trial court's denial of his second postconviction motion to the First DCA, which affirmed the trial court in a *per curiam* opinion. *Criner v. State*, 302 So. 3d 318 (Fla. 1st DCA 2020).

Prior to the appeal of his second postconviction motion becoming final, Mr. Criner filed two postconviction motions relating to sentencing enhancements that were imposed upon him without specific factual findings being made, alleging Sixth Amendment violations. The trial court denied these motions, and the First DCA affirmed these decisions on appeal.

This habeas petition follows, raising the two following claims under *Strickland v. Washington*:

I. COUNSEL WAS DEFICIENT IN FAILING TO RETAIN AND PRESENT A CRIME SCENE RECONSTRUCTION EXPERT AND IN FAILING TO IMPEACH GAVIN BERRY CONCERNING THE FORENSIC EVIDENCE.

II. COUNSEL WAS DEFICIENT IN FAILING TO PRESENT THE APPROPRIATE WITNESS TO TESTIFY THAT THE GUNSHOT RESIDUE ANALYSIS OF MR. CRINER'S HANDS CAME BACK NEGATIVE.

## TIMELINESS AND EQUITABLE TOLLING

28 USC 2244(d) states that a "1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." In this case, the limitation period began to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." *Id.* The statute further states that the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."

The § 2254 one-year statute of limitations is subject to equitable tolling. *Holland v. Florida*, 560 U.S. 631, 634-35 (2010). A habeas petitioner is entitled to "equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Id.* at 649 (quotation marks omitted). These "are separate elements, both of which must be met before there can be any equitable tolling." *Cadet v. Fla. Dep't of Corr.*, 853 F.3d 1216, 1225 (11th Cir. 2017). Deciding these elements requires careful, individualized consideration and a case-by-case inquiry. *See id.* at 1228; *see also Downs v. McNeil*, 520 F.3d 1311, 1322 (11th Cir. 2008).

For Mr. Criner, his conviction became final on March 7, 2007, on the date when the time expired for him to file a petition of certiorari to the U.S. Supreme

18

Court from his direct appeal to the First DCA, making his initial 2244 deadline fall on March 8, 2008. After his direct appeal, Mr. Criner hired the same attorney who represented him in direct appeal to represent him in postconviction. That attorney, Tony Axam, filed a Rule 3.850 postconviction motion on November 8, 2007. This 3.850 motion tolled Mr. Criner's 2244 clock with 122 days remaining on it. The trial court denied that motion on November 26, 2007, and its order was affirmed on appeal. The mandate from the appeal was filed in the trial court on August 14, 2008. If this date were deemed to re-start Mr. Criner's federal habeas clock, his deadline expired on December 14, 2008. Mr. Criner's second postconviction counsel Daley filed a state postconviction motion on March 29, 2009, and Mr. Criner's state postconviction litigation has since been pending until today's date. Although the second state postconviction motion was filed a little more than three months after the one-year deadline (if the August 14th mandate is relied on), there are extensive reasons justifying the application of the doctrine of equitable tolling in this case to this federal habeas petition.

Over the initial several years in postconviction, Mr. Criner received abysmal representation, amounting to a constructive abandonment of counsel, by a succession of not one but two attorneys who would each later be disbarred for egregious behavior in other cases. Throughout all of time since his convictions became final after direct appeal, Mr. Criner has ceaselessly attempted to challenge his convictions

19

in state court, in a succession of trial court and appellate filings. Ultimately in 2011, the Duval State Attorney's Office, recognizing the inequities that Mr. Criner had experienced at the hands of both of the two attorneys who had represented him up to that point in postconviction, agreed to stipulate to the trial court hearing Mr. Criner's belated *pro se* postconviction motion that he had filed in 2009. Mr. Criner then retained new postconviction counsel (Richard Sichta), who along with undersigned counsel conducted an evidentiary hearing on Mr. Criner's behalf, prior to the trial court entering its order on the merits. The same inequities that prompted the State's Attorney's Office and the trial court to permit Mr. Criner's belated 3.850 motion urge this Court to apply the doctrine of equitable tolling in order to accept Mr. Criner's habeas petition as final and to render a decision on its merits. A more detailed history of the early portion of Mr. Criner's postconviction proceedings will be set forth now.

Attorney Tony Axam, who handled the direct appeal and filed the first postconviction motion, was licensed in Georgia and appeared pro hac vice in Florida for this case. Rather than filing a proper post-conviction motion under his name as the attorney (as he had been hired to do), Axam drafted a postconviction motion styled as "pro se" and sent it overnight delivery to Criner in the prison. (This motion merely regurgitated the exact issues raised on direct appeal.) However, before Criner could respond to this mailing, Axam proceeded to file the fraudulently entitled

20

"pro se" motion on his own on November 8, 2007. Once Criner was informed by mail from Axam that Axam had filed that postconviction motion, Criner promptly filed a motion to dismiss the unauthorized postconviction motion filed by Axam on December 5, 2007. After receiving the trial judge's order summarily denying the postconviction motion filed by Axam, Criner additionally filed a "motion for rehearing under unusual circumstances." Before the trial court ruled on Criner's motion to dismiss or motion for rehearing, Axam filed a notice of appeal. The trial court filed orders denying Criner's two motions related to Axam's postconviction motion, but not until after the notice of appeal was filed, which stripped jurisdiction from the trial court and rendered those orders nullities. Nonetheless, the appeal proceeded before the First DCA. The First DCA affirmed the trial court in July of 2008, and the mandate was filed in the trial court on August 14, 2008.

Axam's unethical, fraudulent, and incompetent handling of Mr. Criner's initial postconviction motion severely challenged Mr. Criner's efforts at timely seeking postconviction relief in state court and preserving the timeliness of this federal habeas petition. While Mr. Criner immediately took action on his own after Axam filed the "pro se" motion without Criner's authorization, Criner's pleas and explanations to the trial court were unsoundly rejected. Axam would lose his Georgia bar license for unethical behavior several years later in 2011. *See* "High Profile   Attorney   Surrenders   Law   License," *The   Washington   Times*,

https://www.washingtontimes.com/news/2015/oct/6/high-profile-attorney-surrenders-law-license-amid-/.

After the termination of his first postconviction appeal, Criner hired attorney Bernard Daley. Daley attempted to claw back the clock on the mess created by Axam by filing a motion to recall mandate on the first postconviction appeal with the First DCA and by filing a notice regarding that motion with the trial court.

First, had Daley calculated Mr. Criner's 2254 clock and filed a postconviction motion by December 14, 2008, rather than or simultaneously with filing a motion to recall mandate with the appellate court, the filing of a second postconviction motion in the trial court would have successfully tolled Mr. Criner's 2254 clock before it expired. Daley's work on this case would ultimately string on for several more years, and he also would ultimately be disbarred for unethical behavior in other postconviction cases around the same time that he withdrew from Mr. Criner's case. *See* "Tallahassee Attorney's Law Licensed Revoked," *Tallahassee Democrat*, https://www.tallahassee.com/story/news/2015/05/29/tallahassee-attorneys-law-licensed-revoked/28147923/.

Second, by timely filing the motion to recall mandate with the First DCA, this arguably vitiated the finality of the appeal of Mr. Criner's first postconviction motion, and the appeal did not actually become final until the motion to recall mandate was denied on January 6, 2009. If that position is correct as a matter of

Florida appellate law, then only 80 days of the remaining 122 days of Mr. Criner's federal habeas clock had expired by the time he filed his second postconviction motion on March 23, 2009, and properly filed state postconviction litigation has been sustained (tolling the 2254 clock) from that date to the present. This would render this habeas petition timely under 2254, without the need for equitable tolling.

However, even if this Court does not accept the argument that the initial postconviction appeal did not become final until the motion to recall mandate was denied, the doctrine of equitable tolling can and should be applied here. As the State Attorney's Office previously recognized in waiving certain state postconviction procedural hurdles in order to allow Mr. Criner's second postconviction motion to be heard on the merits, justice and fairness call for Mr. Criner to have his postconviction constitutional grounds heard on the merits. Where his postconviction litigation decisively began going off the rails was in Axam's fraudulent "pro se" filing, which Daley inartfully attempted to fix later with his motion to recall mandate. But Mr. Criner immediately endeavored, upon Axam's fraudulent filing of an incompetent postconviction pleading (raising claims procedurally barred as already heard on direct appeal), to bring this issue to the trial court's attention. However, the trial court inexplicably ignored the very serious allegations alleged by Mr. Criner in his motion to dismiss the postconviction motion and motion for rehearing under unusual circumstances.

23

While the doctrine of equitable tolling should only be applied in limited circumstances, its application is appropriate here. Mr. Criner consistently did everything in his power, including against his attorney's contrary efforts, to "pursu[e] his rights diligently" in postconviction, and he has shown that "extraordinary circumstance[s] stood in his way" in this case. *Holland*, 560 U.S. at 649; *see, e.g.*, *Jimenez v. Butcher*, 839 F. App'x 918, 918 (5th Cir. 2021) (reversing the district court's denial of equitable tolling given that the petitioner pursued his rights diligently and the deception and tardiness of his postconviction attorney rose to the level of extraordinary circumstances).

## *STRICKLAND* LEGAL STANDARD AND AEDPA DEFERENCE

"An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003). Prejudice exists when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

Before this Court may consider Mr. Criner's exhausted *Strickland* claims *de novo* in this 2254 petition, "it must first consider the claim as it was presented to the

state court" and evaluate the state court's decision on that claim. *Whatley v. Warden*, 927 F.3d 1150, 1181 (11th Cir. 2019); 28 U.S.C. § 2254(d)(1). If this Court determines the state court's decision was "contrary to" or "was based on an unreasonable application of Supreme Court precedent . . . [or] an unreasonable determination of the facts," then this Court should review the claim *de novo*. *Id.*

"The 'contrary to' clause in § 2254(d)(1) 'suggests that the state court's decision must be substantially different' from the relevant Supreme Court precedent." *Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002) (quoting *Fugate v. Head*, 261 F.3d 1206, 1216 (11th Cir. 2001), cert. denied, 535 U.S. 1104, 122 S. Ct. 2310, 152 L. Ed. 2d 1065 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). An "unreasonable application" occurs when the state court identifies the correct governing legal principle from the Supreme Court decision but unreasonably applies that principle to the facts of the prisoner's case. *See Lockyer v. Andreade*, 538 U.S. 63 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). Mere error will not suffice; the erroneous ruling must have been "objectively unreasonable." *See Wiggins v. Smith*, 539 U.S. 510, 520- 21 (2003). An "objectively unreasonable" decision requires some incremental degree of incorrectness beyond simple error. *See*, *e.g.*, *Gerstein v. Senkowski*, 426 F.3d 588, 607 (2d Cir. 2005).

"Federal habeas courts generally defer to the factual findings of state courts, presuming the facts to be correct unless they are rebutted by clear and convincing evidence." *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) (en banc). However, "[w]hen a state court's adjudication of a habeas claim results in a decision that is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, this Court is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them." Id. (quotations marks, citations, and alterations omitted). In other words, "[w]hen a state court unreasonably determines the facts relevant to a claim, ''we do not owe the state court's findings deference under AEDPA,' and we 'apply the pre-AEDPA *de novo* standard of review' to the habeas claim." *Cooper v. Sec'y, Dep't of Corr.*, 646 F.3d 1328, 1353 (11th Cir. 2011) (quoting *Jones*, 540 F.3d at 1288).

Given that the First DCA affirmed the trial court's decision on Mr. Criner's appeal without providing a written opinion, this Court's review must "look through" the First DCA's decision to focus its 2254(d) evaluation on the trial court's written order denying Criner's 3.850 motion. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (A federal habeas court reviewing an unexplained state-court decision on the merits should "look through" that decision to the last related state-court decision that provides a relevant rationale and presume that the unexplained decision adopted the same reasoning).

26

## ARGUMENT AND MEMORANDUM OF LAW

## CLAIM I

**TRIAL COUNSEL WAS DEFICIENT IN FAILING TO RETAIN AND PRESENT A CRIME SCENE RECONSTRUCTION EXPERT AND IN FAILING TO IMPEACH GAVIN BERRY CONCERNING THE FORENSIC EVIDENCE, IN VIOLATION OF MR. CRINER'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AMENDMENT.**

Mr. Criner exhausted his state remedies as to this issue. This claim was argued in Ground 2 of Mr. Criner's 3.850 motion. Following an evidentiary hearing with detailed testimony from trial counsel and a crime scene reconstruction expert, and lengthy memoranda of law from Mr. Criner and the state, the court issued a five-page order denying relief. (R 119-123.) Mr. Criner raised this ground on appeal to the First DCA, which affirmed the trial court's denial without a written opinion.

## I.    State court's order

Given that the order of the state trial court was affirmed on appeal without a written opinion, this Court looks to the last reasoned upon, i.e., that of the trial court. *Wilson*, 138 S. Ct. at 1192. The trial court found that trial counsel had a "valid defense strategy" in not presenting the testimony of a forensic expert at trial, because the trial court found that Mr. Criner's postconviction expert's testimony was "speculative, at best," and that "there is no evidence to suggest said testimony would have been persuasive."

27

## II.  **The trial court unreasonably applied Strickland in denying relief, and its decision was based on an unreasonable determination of the facts**

### A.    **Counsel was deficient**

Before conducting a *de novo* review of whether trial counsel was deficient, this Court must consider whether Mr. Criner can show that the state court's ruling on this issue was sufficiently unreasonable to satisfy the standard of 2254(d).

The state trial court's determination that Dr. Knox's testimony was merely "speculative" is unsupported by the record. (R 119.) While a lower court's factual findings are usually entitled to "deference" under Florida postconviction law, they are not entitled to "blind acceptance" and must be supported by "competent substantial evidence." *Bell v. State*, 965 So. 2d 48, 63 (Fla. 2007); *Feldpausch v. State*, 826 So. 2d 354, 356 (Fla. 2d DCA 2002) (finding that because there was no conflicting testimony that required postconviction court to assess credibility of different witnesses, postconviction court erred by rejecting testimony of attorney simply because it did not wish to believe him).

Here, there is no competent substantial evidence supporting the lower tribunal's position, where it cited no portions of the record indicating that Mr. Knox's testimony and opinions were speculative. The lower tribunal cited no countervailing evidence suggesting that Dr. Knox's findings were incorrect. Where the lower tribunal failed to identify any perceived flaws in Dr. Knox's testimony,

28

the testimony given by Dr. Knox was not any more "speculative" than the State's theory at trial.

Dr. Knox reconstructs crime scenes, particularly those involving gunfire, and is an expert in firearms, ballistics, crime scene reconstruction, shooting incidents, bloodstain pattern analysis, photogrammetry, digital multimedia evidence, evidence collection procedures, traffic accident reconstruction, and other related topics. Dr. Knox brings has over 15 years of law enforcement experience in patrol, DUI enforcement, crime scene investigations, and traffic homicide investigations. Combined with an education in mechanical engineering, forensic science, and criminology, he has expertise in reconstructing virtually any type of crime scene. Dr. Knox has a Ph.D. in criminal justice from Nova Southeastern University with an emphasis in applied statistics and probability, data analysis, and qualitative/quantitative measurement. He has consulted on cases in more than half of the United States and has provided law enforcement training in numerous states and other countries. Dr. Knox has testified at trial as an expert witness in state and federal courts across the country.

In this case, Dr. Knox conducted his evaluation based on all of the available forensic evidence and testimony and rendered his opinions based on his training, experience, and education. (R 221-22.). Further, as Dr. Knox indicated, his job in this case was to evaluate the evidence and reach a conclusion as to the events in

questions, not definitively say that the events occurred exactly like Criner said or wholly inconsistent with what Berry said. (R 317.) He believed the "biggest issue in terms of exclusion" was that the shooting could not have occurred where Berry said because of the location of the shell casings. (R 317.) Dr. Knox ultimately opined that the crime scene evidence was subject to multiple interpretations, but that in his opinion, the combination of the evidence indicated that there was a struggle by the sofa at the time of the shooting. (R 317.)

The lower court's reliance on *Maharaj v. State*, 778 So. 2d 944, 951-52 (Fla. 2000) and *Brown v. State*, 827 So. 2d 1054, 1056 (Fla. 2d DCA 2002) as support for its finding that Dr. Knox's testimony amounted to "speculation" is misplaced. In *Maharaj*, the defendant argued that counsel was ineffective in failing to file a motion to recuse the judge because the judge allegedly solicited a bribe. However, during the 3.850 evidentiary hearing, the defendant presented no evidence of the bribe or the judge's participation in a bribe. In fact, evidence was presented that the judge was not involved in any bribe.  Thus, the claim was properly denied as speculative. *Id.*

Similarly, in *Brown*, the defendant filed a 3.850 alleging that counsel was ineffective in failing to move to disqualify the judge. 827 So. 2d at 1056.  In denying relief, the Second DCA noted that the defendant's claim that the judge's known

displeasure with the assistant public defender's representation fifteen years earlier resulted in the trial judge's bias, was "speculative, attenuated, and too fanciful to warrant relief. Further, the trial judge had no discretion at sentencing on Brown's sexual battery conviction…." *Id.*

Unlike *Maharaj* and *Brown* where the defendant presented no evidence in the 3.850 hearing in support of its failure to disqualify the judge claims, Mr. Criner used Dr. Knox to provide extensive testimony concerning the same crime scene evidence the State used, which differed from the State's crime scene interpretation. Thus, the trial court's casual dismissal of Dr. Knox's testimony as speculative, in opposition to the face of the postconviction record, renders that factual conclusion unreasonable, as well as the application of *Strickland* to those facts. Accordingly, AEDPA deference should not be applied, as Mr. Criner has satisfied 2254(d) here.

Moving to a *de novo* consideration of deficiency, the record demonstrates the State's case supported a heat of passion, attempted second-degree murder case more than a premediated case, if not a case of pure self-defense. As argued in detail below in the prejudice section, powerful evidence refuting the State's premeditation theory could have been presented at trial through a crime scene reconstructionist such as Dr. Knox. However, trial counsel was unaware of how that testimony could have been challenged due to a failure to investigate and consult with such an expert.

"One of the primary duties defense counsel owes to his client is the duty to prepare himself adequately prior to trial." *Magill v. Dugger*, 824 F. 2d 879, 886 (11th Cir. 1987). "Pretrial preparation, principally because it provides a basis upon which most of the defense case must rest, is perhaps the most critical stage of a lawyer's preparation." *Id.* "Case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them." *Rose v. State*, 675 So. 2d 567, 573 (Fla. 1996) (quoting *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991)).

Due to trial counsel's admitted failure to consult with a crime scene expert prior to trial and present the expert at trial, the state's theory that Mr. Criner opened fire on the victims as they peacefully played a video game went virtually unrebutted and was easily cast aside by the state. (e.g. TT 1298.) Further, due to counsel's failure to retain the appropriate expert, defense counsel actually assisted in *advancing the state's theory*, when he unsuccessfully attempted to get law enforcement officers to agree that there had been a struggle. Counsel's failure to retain a crime scene expert is a deficient performance under these circumstances. *See Williams v. Thaler*, 684 F. 3d 597, 604 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 866, 184 L. Ed. 2d 679 (2013) (counsel's performance was unreasonable where it failed to "obtain any independent ballistics or forensics experts, and was therefore

unable to offer any meaningful challenge to the findings and conclusions of the state's experts, many of which proved to be incorrect").

As explained more fully in the statement of facts above, Mr. Berry testified that his friend, Mr. Criner, opened fire on Berry, Hicks, and Brown from behind while the three men were playing a video game. Berry said he was seated on the left-hand side of the room next to the TV on the first couch, that Brown was in the middle in a purple beach chair, and that Hicks was seated on a black table, also facing the TV. (TT 299.) According to Berry, he fell back on the black couch after being shot and played dead. (TT 302.) He claimed that as Criner exited the residence, Berry chased after him, and they wrestled for five minutes or so before Criner pushed Berry off and exited out of the house. (TT 308.) Critically, Mr. Berry testified unequivocally that all three of the victims were seated, holding video game controllers at the time of the shooting, a point which was critical to the state's theory that Mr. Criner opened fire on unsuspecting victims in a premeditated fashion and that no struggle occurred.

In *State v. Fitzpatrick*, as here, the case hinged on the jury's belief as to which party interpreted the forensic evidence correctly. 118 So. 3d 737, 753, 755 (Fla. 2013). The Florida Supreme Court determined counsel was deficient because he was demonstrably unable to understand the evidence or present a cogent defense without both consulting with and presenting an expert. *Id.* The *Fitzpatrick* court

noted, in finding counsel deficient, that "[d]espite the scientific evidence that would implicate his client if not refuted, counsel failed to retain any forensic or medical experts." *Id.* at 754.

Contrary to the lower court's finding, trial counsel's failure to present available evidence through a forensic expert cannot be excused as a valid trial strategy (R 120-21) because counsel failed to even *consult* with an expert to determine how the expert could assist in the case, if at all. Decisions made without an investigation cannot be excused as strategic. *See id, Fitzpatrick*, 118 So. 3d at 753, 755 (finding that trial counsel's "unpreparedness" and failure to prepare himself to present an intelligent or knowledgeable defense supported a finding of deficient performance: "postconviction evidence demonstrates that counsel's preparation and performance were constitutionally inadequate, and his decisions before and during trial were not tactical or reflective of a reasonable trial strategy"). Counsel cannot make a strategic decision without conducting the requisite investigation. *Rose*, 675 So. 2d at 573 (quoting *Zant*, 941 F.2d at 1462).

Additionally, counsel admitted that certain issues, such as his failure to impeach Berry about whether all three victims were holding game controllers at the time of the shooting, "didn't [even] occur" to him prior to trial. (R 165.) Counsel admitted he "didn't understand" the State's theory about the three controllers "until

trial time," but he did not think it was important. (EH 168-69,184-86.) He admitted he "didn't" investigate the issue and assumed there was only one controller. (R 173.) Counsel also testified that he did not think the controller matter was "an issue for me at the time." However, he conceded that "that's something that I might have overlooked as an issue." (R 172). Counsel's failure to address Berry's inaccurate videogame controller testimony, cannot be considered a valid trial strategy, because it was based on counsel's ignorance as to the issue. *See Fitzpatrick*, 118 So. 3d at 755 ("Counsel's unpreparedness was further demonstrated during counsel's evidentiary hearing testimony which indicated that at the time of Fitzpatrick's trial, he did not understand the difference between motile and intact sperm. This fact alone exemplifies the objective unreasonableness of his performance.").

### B.    The resulting prejudice

The state court's prejudice determination was an unreasonable application of *Strickland* and its progeny, as well as an unreasonable determination of the facts, in its summary conclusions that Dr. Knox's testimony was "speculative" and that "there is no evidence to suggest the jury's verdict would have been affected." The trial court's order contains zero explanation of which portions of Dr. Knox's findings and analysis it considered to be speculative.

The prosecution's case at trial relied significantly on the credibility of Mr. Berry's testimony, which it bolstered with its interpretation of the evidence, that

35

all of the victims were sitting and playing a video game when Mr. Criner opened fire, "execut[ing]" two men and injuring a third, by shooting them "in their backs." (TT 1266, 1298) "[T]he physical evidence," argued the prosecutor in closing, "cannot lie." (TT 1264.) Premeditation, the state argued, was established exclusively through Mr. Berry's testimony. (TT 1269.) "You can believe Gavin Berry," argued the state, "because what he says is backed up by the physical evidence." (TT 1271.) The state argued that "the DNA evidence shows that the people in that room were where they said they were. Gavin says after he was shot he tussled with the defendant by the door and, lo and behold, we find a lot of Gavin Berry's blood on that door, both inside and out." (TT 1277-78.)

The state argued that the position of the bodies "shows you that Gavin Berry is telling you the truth. Gavin Berry said Ike Brown was sitting in that chair, and lo and behold, we have a photograph that proves that Ike Brown was in that chair…" (TT 1281.) "He was shot in that chair facing that TV with the remote control in his hand and that's premeditated murder." (TT 1302.) The state argued that the physical evidence was consistent with Ike Brown "being shot in that chair and the blood dropping right where he was shot." (TT 1275.) The state argued in close that the "game controller," was forever "burned" in Det. Smith's mind, "after seeing those bodies, that he will have to live forever with that image of a young boy with a controller and a bullet in the back of his head." "And that control shows that what

36

Tiffany Heggs says…what Gavin Berry says immediately after his incident, and the physical evidence they were playing video games…" (TT 1281.) "Tiffany Heggs, the DNA, the positions of the bodies, the number of bodies, the bullet strikes, the bullet entries front and back, the angles of the bullets, all tell us one thing, that that man is guilty of premeditated first degree murder." (TT 1282.)

Despite the state's exclusive reliance on Berry's testimony and its own interpretation of the physical evidence to establish premeditation, trial counsel, as pointed out by the prosecution, offered nothing but "possib[ilities]" to support its defense: "There are possible doubts in this case. There are possibilities. And [defense counsel] asked question after question after question after question after question about what was possible, about what was possible. And answer after answer, it's possible, it's possible, I guess it's possible…" (TT 1300.) "There are always alternative explanations, there are always two sides, but what's reasonable? What makes sense? What jives with the evidence?" (TT 1300.)

However, had counsel used a crime scene expert at trial, the jury would have heard the critical defense points countering the State's narrative and argument. Unlike the testimony and the state's argument heard at trial, Mr. Criner presented evidence in postconviction through Dr. Knox that refuted major aspects of the State's case.

37

Dr. Knox, a highly regarded forensic consultant and crime scene reconstructionist both locally and internationally, testified at great length from a PowerPoint presentation on the defendant's behalf during the postconviction evidentiary hearing. Dr. Knox testified that his task for Mr. Criner's case was to reconstruct the evidence, which entailed figuring out what the physical evidence portrayed and said about how the shooting took place and also making comparisons to the trial testimonies as to whether or not the physical evidence was consistent or inconsistent with that. Dr. Knox's analysis determined that there was no evidence that conclusively supported the State's theory that Mr. Criner possessed and discharged a firearm with a premeditated design as the victims sat unsuspectingly while playing a PS2 video game.

Mr. Criner testified at trial that the shooting was accidental and the result of an altercation with the surviving victim Berry, who produced a firearm in the midst of the altercation, which they both struggled over and shots were fired involuntarily. The firearm discharged six times in the midst of the struggle without Mr. Criner ever having actual possession of it, which was consistent with the absence of GSR on Mr. Criner's hands.

Dr. Knox testified that he disagreed with much of the testimony given by surviving victim Berry because it was inconsistent with the evidence. The key evidence that supports an entirely different evidentiary picture and theory of events

38

were the six spent shell casings that not only clarifies where the shots were discharged from in the room at the time of shooting, but also corroborates Dr. Knox's testimony that none of the victims were seated unsuspectingly when shot and puts all the alleged victims in a different area and facing different directions that would be consistent with their entry wounds. The evidence of the six spent shell casings were, as Dr. Knox testified, "the biggest evidence of exclusion" when it came to the terms of what scenario was plausible among the different theories of the events that took place and the evidence.

GSR test results of Mr. Criner's hands were consistent with a person who had not possessed and discharged a firearm, as Dr. Knox stated in his testimony: "[Y]ou would expect negative results when a person hasn't fired a gun." This is consistent with Mr. Criner's testimony that he never possessed a firearm nor discharged one and that it was Berry who produced a firearm and they both struggled over it and shots were discharged by accident, involuntarily striking the victims who were in the midst of trying to break the altercation up before shots were fired.

Dr. Knox further testified that there was no possible way that victim Brown was seated and holding a video game controller and shot from behind. Dr. Knox noted that there was several things that disproved the State's theory on this point: "The position of victim Brown's legs being outstretched and his buttocks not on the chair seat, and actually off the seat area, along with his right arm resting awkwardly

in the right armrest of the chair that was bent and broken significantly from where it would normally be and confirming with the victim's arm." Dr. Knox explained that, based on the many shooting crime scenes he has studied, Brown's resting position was consistent with him having been standing in the general area when he was shot. Brown's fatal gunshot wound was one described by medical examiner Dr. Arruza as immediately incapacitating, resulting in immediate paralysis. Brown would have fallen wherever he was standing, wherever that happened to be. The best indicator from the evidence of where Brown was standing at the time of the shooting is the general area of where his feet were. That positioning was consistent with him having been off balance or stepping or moving backward at the time he was shot and falling into the chair, breaking the armrest of it.

Dr. Knox further elaborated that he did not agree with medical examiner Dr. Arruza's conclusion that Brown was seated when shot, stating that he didn't know what her basis was being that her report was not well articulated. But based on the evidence, "the simple fact that victim Brown wouldn't slide out of the chair just from being shot because when you're sitting in the chair your weight is balanced on your buttocks. The victim's outstretched legs and basically straight body and barely in the chair with the armrest broken and pent the way it was, were all indicators that victim Brown had fallen into the chair rather than just sitting there at the time that he was shot."

40

Dr. Knox testified that another exclusionary piece of evidence that demonstrated that the State's theory of events was inconsistent with the evidence were the dowel rods, which were used by evidence technicians to determine the direction of shots fired. Dr. Knox testified that the angles were too high for Mr. Criner to have been positioned across the room and behind the victims when he allegedly opened fire. This explains why there was not one single shell casing on that side of the room where Mr. Criner allegedly was when shooting.

Finally, Dr. Knox noted that victim Berry's wound was more consistent with him being shot while someplace other than seated on the sofa, as he testified to, due to the direction of the entry wound, stating: "it wasn't possible."

In summary, Dr. Knox's testimony, not presented in any fashion to the jury at trial, would have severely undermined critical pillars of the State's key witness' testimony and its argument. Dr. Knox concluded that the young men were not all holding video game controllers while  Mr. Criner shot them for no reason. Rather, the evidence indicated that there had been a struggle; that the shots were not fired from the area of the room that Berry claimed; that Berry could not have been seated on the black couch when the shots were fired, as he claimed; that Brown was not seated in the chair he was found in when he was shot; that Hicks' wound, which was slightly upward, was not consistent with being shot while seated; that Hicks was not

holding a controller when he was shot; and that Berry nor Brown were holding controllers. Dr. Knox also testified that the trajectories, location of the shell casings, and blood spatter analysis indicated that the shots came from the other side of the room, not where Mr. Berry claimed that Mr. Criner opened fire. Dr. Knox unequivocally stated that it would not have been possible for the shell casings to have ended up where they were had Mr. Criner fired near the back of the room like Berry said.

Given the evidence presented in postconviction, not only would the jury have heard a viable alternative theory from the defense had defense counsel consulted with and presented a crime scene expert, but Mr. Berry's testimony concerning the events would have been significantly undermined.

## III.  **Conclusion**

Given that Mr. Criner has shown the deficiency of his trial counsel in failing to adequately utilize expert testimony regarding the forensic evidence to undermine the implausible narrative of the state's primary witness, this Court should reject the state court's unreasonable legal and factual conclusions and grant Mr. Criner relief. As to prejudice, that analysis must be conducted cumulatively with the prejudice caused by counsel's deficiency in failing to present expert testimony regarding the absence of GSR on Mr. Criner's hands, which is discussed in Claim II.

<u>**CLAIM II**</u>

**TRIAL COUNSEL WAS DEFICIENT IN FAILING TO PRESENT THE APPROPRIATE WITNESS TO TESTIFY THAT THE GUNSHOT RESIDUE ANALYSIS OF MR. CRINER'S HANDS CAME BACK NEGATIVE, IN VIOLATION OF MR. CRINER'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AMENDMENT.**

Mr. Criner exhausted his state remedies as to this issue – it was presented as Ground 3 of his 3.850 motion, raised on appeal to the First DCA following the trial court's summarily denial, and PCA'd by the First DCA.

**I.    <u>Introduction</u>**

Samples from Mr. Criner's hand were tested for gunshot residue (GSR) and came back negative, despite evidence suggesting that he would not have had time to wash or otherwise remove GSR following the shooting. This was critical to the defense case because the state's main witness, Mr. Berry, testified that Mr. Criner suddenly shot the victims for no reason and no one else fired a gun. Due to defense counsel's error, this exculpatory evidence of negative GSR was not presented to the jury.

**II.    <u>State court's order</u>**

The state trial court's order acknowledges that Mr. Criner proceeded forward at the evidentiary hearing with the GSR ground (Ground 3 in the second postconviction claim), its order appears to overlook this ground in its analysis. After beginning its analysis by stating in a conclusory fashion that "[t]he testimony of

43

Defendant's trial Counsel, Tom Fallis, showed a valid defense strategy was presented to the jury for their consideration," the rest of the order only references Dr. Knox's testimony (barely) and does not even contain a reference to the GSR evidence presented in postconviction.

## III.    **The trial court unreasonably applied Strickland in denying relief**

### A.    **Counsel was deficient**

The state trial court's order did not address the question as to whether Mr. Criner's defense was deficient, but the above facts and law answer this question in the affirmative. Because the state court did not decide whether Mr. Criner's counsel was deficient, this Court should review this element of his *Strickland* claim *de novo. See*, *e.g.*, *Brumfield v. Cain*, 135 S. Ct. 2269, 2282 (2015); *Jenkins v. Comm'r, Ala. Dep't of Corr.*, No. 17-12524, at *56 (11th Cir. June 29, 2020) ("[T]he state court did not rule upon this issue, so there is nothing to which we must defer under AEDPA.").

Addressing the issue of deficiency *de novo*, as explained in the statement of facts, FDLE's Debra Lightfoot testified in postconviction that she found no gunshot residue present in any of the samples taken from Mr. Criner's hands. (R 209.) Actually holding a gun when it was fired would "certainly" result in an individual having more GSR deposited on his/her hands than if a person were standing further away from the gun. (R 211.) Lightfoot did not do any GSR testing on Jeffrey Hicks,

Isaac Brown, or Gavin Berry. (R 213.)

Defense counsel was aware of the critical importance of Ms. Lightfoot's testimony and testified during the postconviction evidentiary hearing that he attempted to get her results in through a detective at trial, but failed because the state lodged an appropriate hearsay objection. (TT 891-92.) Defense counsel naively believed the state would overlook a valid hearsay objection "in the interest of justice." (R 154, 197.) Defense counsel admitted that he would have loved to get the GSR results in and argue them, but could not do that because the witness was not allowed to answer the question. (R 155.) Counsel was "dumbfounded" "that the State wouldn't want to make sure justice was done and not just winning, but that was something I wasn't ready for and so I couldn't argue it the way I wanted to argue it." (R 155.)

Defense counsel seemed to contradict himself later by claiming he did not want to call the FDLE analyst to get the results in because he had not deposed her and she could have "give a whole bunch of reasons" why the GSR was not there. (R 197-98.) However, he conceded there is no negative connotation that could have been brought out from the negative GSR results. (R 201.) Due to counsel's failure to present the correct witness (the FDLE analyst) at trial, the defense was ultimately unable to present the negative GSR results.

Florida's federal Southern District in *Troedel* found that counsel was

deficient in failing to retain and present a defense forensic expert at trial under similar circumstances. *Troedel v. Wainwright*, 667 F. Supp. 1456, 1457 (S.D. Fla. 1986). There, the state presented evidence at trial that both Mr. Troedel and his codefendant had gunshot residue on their hands but that the evidence indicated that Mr. Troedel was the shooter. *Id.* at 1438.  The defendant argued in postconviction that his counsel failed to investigate and consult with experts concerning the GSR testimony, and the court found deficiency. *Id.* ("Petitioner has presented, by way of deposition, expert testimony to the effect that the opinion of the State's expert was not accurate, and has shown that such expert testimony would have been helpful in cross-examining and/or rebutting the State's expert. . . . .").

Again, a similar situation occurred in Fitzpatrick. Counsel in Fitzpatrick attempted to get DNA evidence from the autopsy in at trial, but he was unable to do so because he attempted to get the testimony in from the wrong witness:

> Counsel's testimony indicates that he believed the presence of DNA from an unknown male contributor under Romines' fingernails was critical to Fitzpatrick's claim of innocence…In counsel's view this was a critical issue, yet he failed to take the elementary steps to properly authenticate the fingernail evidence from the autopsy to present Ragsdale's testimony and this evidence.

> * * *

> Even if we were to presume that counsel made a strategic decision to introduce the DNA evidence from the autopsy, his careless actions and lack of proper preparation thwarted his ability to accomplish this intent. While we give great deference to counsel's performance, a trial strategy

cannot be considered reasonable unless it is executed properly. Thus, we conclude that these failures which prevented counsel from presenting the DNA results from the fingernail evidence recovered during the autopsy were not "strategic choices made after thorough investigation of law and facts." *Strickland*, 466 U.S. at 690. Accordingly, we hold that counsel was deficient for failing to understand what evidence he wished to admit and to pursue the proper course of action to admit the fingernail evidence that he intended to use in Fitzpatrick's defense.

*Fitzpatrick*, 118 So. 3d at 768-69 (emphasis added).  Here, similar to *Fitzpatrick*, trial counsel considered the utter lack of GSR on Mr. Criner's hands to be important for his defense, because it indicated that Mr. Criner was not holding the weapon when it was fired. However, due to counsel's failure to call the correct witness for its introduction into evidence, the jury never heard it. Counsel's legally invalid attempt to get the information in as hearsay cannot absolve him from his failure present the FDLE analyst who conducted the testing. *Id.* Further, counsel's explanation that he had not deposed the analyst does not constitute valid trial strategy because the failure to depose was a failure to investigate. *See Id.* at 755; *Rose*,  675 So. 2d at 573; *Zant*, 941 F.2d at 1462.  In any event, as conceded by counsel,  there was no potential downside to her testimony. (R 201.) A deficient performance is established. *See Smith v. Sec'y, Fla. Dep't of Corr.*, 626 F. App'x 246, 249-50 (11th Cir. 2015) ("Not moving to admit the negative gunshot-residue tests from Smith arguably bolsters the first strategy, but the results also would have supported Smith's

contention that he was not the shooter. Given that the first strategy (shoddy investigation) is in service of the second (actually innocent), we find it difficult to accept that reasonable counsel would, as a matter of strategy, elect not to introduce exculpatory evidence.")

### B.     Mr. Criner was prejudiced by counsel's failure to on evidence of GSR.

The state trial court also failed to conduct any analysis or make specific findings as to the prejudice caused by the lack of GSR evidence presented at trial.Because the state court did not decide whether Mr. Criner's counsel was deficient, this Court should review this element of his *Strickland* claim *de novo. See*, *e.g.*, *Brumfield v. Cain*, 135 S. Ct. 2269, 2282 (2015); *Jenkins v. Comm'r, Ala. Dep't of Corr.*, No. 17-12524, at *56 (11th Cir. June 29, 2020) ("[T]he state court did not rule upon this issue, so there is nothing to which we must defer under AEDPA.").

Considering prejudice *de novo*, the significance of a negative GSR result to Mr. Criner's case is clear.  Where Mr. Berry testified that Mr. Criner was the shooter, and Mr. Criner said the gun went off as the result of a struggle, negative GSR results on Mr. Criner's hands would have supported his position. This was especially important because Mr. Berry's hands were never tested, and Mr. Criner never gave any confession to premeditatedly firing a gun at his friend.

Counsel testified at evidentiary hearing that he understood the importance of the jury hearing that the GSR samples collected from Mr. Criner's hands were negative.  It would have been virtually impossible for Mr. Criner to have fired seven shots without getting GSR on his hands.  Further, Mr. Criner was not wearing gloves, and did not wash his hands prior to the collection of GSR samples – he was too busy running from Mr. Berry and running from the police following the shooting. It is unlikely that there would not be *any* GSR on his hands merely from touching other objects in the intervening period between firing the gun and being handcuffed by police.

Defense counsel agreed that his argument at trial would have been much more effective if he had been able to present the GSR testimony he wanted.  (R 156.)  This would have assisted with his argument that Berry's testimony that Mr. Criner was the only one with the gun was not credible. (R 157.) Having the GSR evidence at trial "would have been very helpful." (R 157.) It would have shown that there was a struggle, and not premeditated murder. (R 158.)

## IV.   <u>Conclusion</u>

Based on the clear deficiency and prejudice of the absence of the exculpatory GSR evidence being presented to the jury, Mr. Criner should be granted relief on this ground. As to prejudice, that analysis must be conducted cumulatively with the prejudice described in Claim I above.

## <u>CONCLUSION</u>

Mr. Criner petitions this Court to grant relief by vacating his three convictions based on both of the claims raised above and ordering that he be granted a re-trial.

Respectfully submitted,

/s/ Joe Hamrick
**JOE HAMRICK, ESQ.**
Fla. Bar No. 47049
1999 West Downer Place
Aurora, IL 60134
 (630) 897-8764
jhamrick@dreyerfoote.com
Attorney for Petitioner

LEGAL MAIL PROVIDED TO
COLUMBIA CORRECTIONAL INSTITUTION
ON _____ (DATE) FOR MAILING
Staff Initial _____   I/M Initial

## <u>OATH</u>

I declare and verify under penalty of perjury that the foregoing is true and correct.

Takoya Criner
Fla. DOC # J28952